Our next case is Rhenetics. I think I finally learned to pronounce it correctly. In Lidos v. Apple, 2019-1050. Mr. Lee. Thank you, Your Honor. May it please the Court, my name is Bill Lee, and together with my partner Brittany Amati, we represent Apple. In an earlier case, Apple lost the judgment on the same patents at issue before you. Apple then did precisely what the law encourages, it redesigned the features of the accused products, FaceTime and VPN On Demand, to avoid infringement. Those redesigned products, the features of which are not in dispute, do not infringe asserted claims of the patent. So let me go directly to the 504 and 211 patents. The district court erred in concluding, and then instructing the jury, that a DNS system does not include a DNS. As the panel knows, every claim of the 504 and 211 patents requires a domain name service system, or DNS system. As the court also knows, the district court construed the embedded term domain name service, or DNS, as requiring the return of an IP address. Notwithstanding that, the district court instructed the jury that the term DNS system does not incorporate the concept of a DNS. Are you talking only about claim five? No, we're talking in this instance, Your Honor, about all the claims. Claim five is dealt with separately on the collateral estoppel issue, but all of the asserted claims of the 504 and 211 have this requirement of a domain name service system. They also, as a consequence, we say, include the concept of a domain name service. That is what the claims say on their face. It's a little bit, the instruction of the court, it's a little bit as if you took the words court of appeals for the federal circuit and then instructed the jury that it doesn't include a court. It doesn't make any sense. Does it matter that, I think I'm looking at the right page, 2758, what the judge told the jury was you were instructed that the construction for domain name service system, an element of all the asserted claims of 504, 211, does not incorporate or include the Because the court adopted that conclusion and gave that instruction, we were precluded from putting into evidence the non-infringement defense that would have demonstrated both the design around and no infringement. A domain name service, as defined in the first case, as consistently defined, requires the return of an IP address. The focus of the first case in this And in the first case, the accept push returned an IP address. Apple then redesigned after the first case. But it sends some other information from which in the end, the callee makes a direct call to the caller. Actually, Your Honor, that's wrong as a matter of fact and wrong, completely unsupported by the record. Isn't it, it sends a certificate plus some other information and it allows the callee to make the call to the caller, at which point they're both exchanging IP addresses, but more importantly, having a direct connection. Your Honor, that's what Vernetix would have you believe. Tell me why that's wrong. It's incorrect. The first thing is, we should focus on what Vernetix claims is the domain name service. So, set aside for a second, the claim construction error. Let's assume that it requires a domain name service. Let's assume that that requires the return of an IP address. The thing that was with the IP address return. That's it. We took the IP address out. There is nothing in the accept push, nothing that would satisfy the name of a domain name server. The fact that there is another portion of the product that would allow you eventually to a relay server or direct an independent protocol to make a call doesn't satisfy the limitations of the claim. So, the argument that was made to you is an argument that is completely unrelated to the allegations that were made at trial. So, there are two problems for Vernetix. The first on this is, they would have you conclude that the phrase domain name service system does not include a domain name server. That service, that makes no sense as a matter of the plain language. It is inconsistent with the specification. It is inconsistent with Judge Davis's rulings previously. It's inconsistent with the manner in which their own expert testified in the first case. And your honor, it's in fact inconsistent with every action by all the parties until we redesign the product. And when we redesign a product to take out the caller ID, the callee ID, which was what was specifically identified in the first case as providing the domain name service, all of a sudden, all of a sudden, the correct construction of the domain name service didn't include the return of the IP address. Now, I think there are two things that would indicate to you that that's a problem for Vernetix. The first is, there is really no substantive argument made to you on the claim construction issue. There's no substantive argument to support the concept that you can take domain name service system and make the first three words completely irrelevant and inconsequential. The second is that their argument that this doesn't require a reversal as to the FaceTime products. And I should say it's important, your honor, because the FaceTime products or the products accused of infringing the FaceTime feature, the FaceTime feature is a different set of products than those that were accused of infringing by the VPN on-demand feature. They overlap to some degree, but there are products that are subject to the revenue base for FaceTime that were not in VPN on-demand. So you have, first, a claim construction issue and consistent conduct or consistent interpretation. And it's consistent with the words, it's consistent with the specification, it's consistent with Judge Davis's interpretation, it's consistent with the first trial, and it's consistent with logic and common sense. What you get this time around... Did Apple propose this construction to it? You proposed something without it. Judge Davis said, I don't need it because the rest of the claim language specifies exactly what this device is supposed to do. Your honor, 80% correct, 20% I think requires clarification. They did propose it precisely as is. We've never disputed that portion of it. We said in the first case that there was an additional requirement that there be a determination of whether the domain name was a standard domain name or a top-level secure domain name. Correct me if I'm wrong, I thought your claim construction did not actually include what theirs did, which is that the domain name service system had to have a domain name service function. Your honor, respectfully, that's not correct. Ours had that and required more. And both parties consistently said it requires the Once Judge Davis interpreted the claim, and this is at A22214, this is where he made his interpretation, and he said it's a lookup service that returns an IP address for requested domain name to the requester. That's what everybody lives with. So you have before you a claim interpretation that is incorrect as a matter of law, inconsistent with the claim language, inconsistent with the specification, inconsistent with the conduct of the parties. You have before you an undisputed design around product that removes the very feature, the callee ID that had been identified as that which created a domain name service. And at the end of the day, it is an error of consequence because the revenue basis for FaceTime and Veepkin on demand are different. And because the jury rendered its substantial verdict based upon infringement of four patents. Okay, can I? Mr. Lee, would you move to the question of issue preclusion regarding invalidity defense? Yes. So, your honor, we suggest, and we've argued too in the briefs, that voter verified addresses that issue. Now, when the district court decided that having pursued an anticipation of Section 102 defense in the first case, we were issue precluded on all invalidity defenses, the district court acknowledged that the court had not yet reached that issue. You have, in our view, we disagree, reached that issue and voter verified where notwithstanding the assertion of 102 and 103 defenses previously, the court reached the Section 101 defense as verified. If the district court was correct, and all invalidity defenses were part and parcel of the same, voter verified would have come out differently. As a matter of the statute, where Section 101, 102, and 103 are independent bases to invalidate a patent. Why should one be able to pick and choose, make one defense and if one loses, come back later on with others? Your honor, that's the argument. The reality is when you have a five-day trial, you pick your best defenses and you try them. And if you've tried them, you should be issue precluded. But if you have not tried them and they're not part of the trial, which is what happened here. That's a decision you made. That's a strategic decision. It's a strategic decision you make, your honor, but it's not a strategic decision that should determine whether there's issue preclusion or not. As a matter of statutory, of the statute, Section 101, 102, and 103 are different provisions. As a matter of the legal principles that govern them, they are different provisions. Notwithstanding the preclusion argument, how about the fact that this Claim 5 has already been found invalid in other patents? They should be the same thing. Why would we consider it still alive for the purposes of this case? It has, your honor. That takes us to the second issue preclusion argument. And let me say this about it quickly and then I just want to mention something very quickly on viewpoint on demand. All of the asserted claims except for Claim 5 of the 504 patent have been determined not patentable as a result of final decisions of this court. There in fact have been now, I think, seven decisions of this court looking at 12 patents that come from these common specifications invalidating 341 claims. The only claim standing that allows us to do anything with face time is Claim 5 of the 504 patent. It is patentably indistinct from Claim 5 of the 211 In fact, if anything, it's broader. Now the arguments principally made to you, and I'm not going to, I don't want to use all my rebuttal time, but the arguments made to you are principally procedural arguments. There's a little bit of an argument that they're patently distinct. They're not. If the court applies the principles you would apply in an obviousness double patenting case, they're not indistinct at all. The fact that those claims, that Claim 5 of the 211, has been determined not patentable should collaterally stop them from asserting that it is here. And it certainly doesn't make sense to have the affirmation of a judgment of this magnitude depend upon a claim that is, according to us, both not patentable and they're collaterally stopped from doing so. Can I just ask you, I mean, I understand that Vernetics' argument is whatever the effect of 211-5's unpatentability on 504-5's unpatentability, it cannot at present be a matter of issue preclusion for the simple reason that the burden, the level of proof is different between the board proceeding and the district court. It may, as you have argued, be awfully close to being declared soon by the board to be unpatentable under the same standard, maybe even for collateral estoppel, but it hasn't yet, and in the absence of that, we can't collaterally stop in the district court where the burden is clear and convincing of it. Your Honor, I think that's an argument that's made to you, and it's incorrect. I'll do it with whatever rebuttal time I have. If you take the X-Y decision, if you take the non-precedential decision of last week in the Ale case, you can collaterally stop what happens in the district court with a decision from the PTO. Is it collateral estoppel, or is it just that the patent is dead, the claim is dead? It's a great question, Your Honor. I think the best way to view it, and no, I don't think anybody's addressed this precisely as this, for the claims that were specifically at issue before the PTO, which is all the claims but Claim 5 of the 504, they are deader than a doornail. The only question left is Claim 5 of the 504 patent, and if it's patentably indistinct, the combination of the X-Y decision and the Ale decision and the Ohio Willow decision gives you a very simple and compelling logic, which is this. If you have a How can it be that in a district court, someone is allowed to pursue a claim based upon that patentably indistinct, not patentable subject matter? Last sentence I'll say, if I could. On the VPN on-demand claims, again, we designed a round. The claims are very specific. They require three different things. They require a determination. They require something happening in response to the determination, and they require being automatic. We took that out. We stopped doing it. There is no infringement. Thank you, Your Honor. We'll give you three minutes for rebuttal, Mr. Lee, Mr. Lampkin. Thank you. May it please the Court. I'd like to begin where Mr. Lee began, which is whether or not the DNSS, the Domain Name Server System, necessarily incorporates all the features that are found in a traditional domain name server, such that it has to return an IP address. We think the claims make absolutely clear that that's not the case. So if I could turn to page 45, where we actually have the claims laid out in our brief. If you look, the third bracket limitation is to receive a query for a network address. I'm sorry, page what? 45 of our brief, Judge Toronto. Your brief, sorry. The third one is to receive a query for a network address. But if you look at the limitations, returning a network address, like a conventional prior domain name server might or would, it's not in there. That is a very telling omission. And in fact, one of the critical elements of the invention is, rather than doing what an old domain name server would do, is return something other than an IP address. And that's the fourth item. To comprise an indication that the domain name server system supports establishing a secure communications link. So what happens is, it gets a request for an IP address, but it doesn't give one back. It gives an indication that the system supports a secure communications link. It's also evident that it doesn't incorporate every element of a prior art conventional DNS for a second reason. If you look, the first three items, connected to a communications network, storing a plurality of domain names and corresponding network addresses, and receiving queries for network addresses, those are all things that a standard RR domain name server would do. If we incorporated everything that they do. Can I just ask, are you suggesting that one or more of the four elements of this claim one is actually inconsistent with it being what you would call a conventional DNS by which, I guess, I think the parties mean returns an IP address? Yeah, I think the fourth one is what it's returning. And it can also return, and there's a dependent claim which has it returning an IP address. Why is returning an indication that the system supports establishing a secure communication link inconsistent with returning an IP address? Now, I'm not saying that it's inconsistent because there is a dependent claim which says return an IP address. And that I believe is claim five. So when they wanted to include a returning, I'm sorry, it's claim 15 on page 261. It says the system of claim one wherein the domain name service system is configured to require it to return a network address. They included explicitly in a dependent claim. This claim omits it entirely. And it omits it even though the first three elements, the first things, being connected to a network, having a priority of network name or domain names, and receiving queries are things that typical domain name, conventional domain name servers do all the time. Those would be completely superfluous if this system had to do and had to have everything that a conventional domain name service does. And then in addition, if you turn to the specification, there's a figure there, figure 33, and that's on appendix page 230. And it lists a standard DNS with the label STD DNS. And so when the draftsman wanted to say standard DNS, they said standard DNS. So if you also look at appendix page 254, column 39, line 6023, talks about conventional domain name services. Or appendix 259, column 50, line 37, standard DNS. What this invention was is it took something that preexisted, your conventional domain name server, and it used it for a completely different purpose. Rather than just returning IP addresses, it gives you the indication that this system supports secure communications links. It's inappropriate to go back and say, well, we're going to read into it. A further limitation, it doesn't have. And require it to do everything a standard DNS does, including an IP address. Mr. Lampton, would you address the preclusion issues relating to invalidity number one, and then claim five? Sure. So first with respect to whether Apple is a stop from litigating invalidity. The answer we think is yes. And it's for actually a much more direct reason. And that is that obviousness was actually litigated in the first trial. Apple tried to remove and asked for a dismissal without prejudice of its obviousness counterclaim. And the district court said no, and the reason was it wouldn't agree to dismissal that Apple would not agree to dismissal. It wouldn't have the same effect as if we tried it to a jury, and the jury returned an adverse finding, and the court entered judgment on the finding adverse to Apple. So Apple tried to withdraw its counterclaim of obviousness, and the district court said no. And when the district court says no, you can't withdraw it. You have to try it. And the issue actually was tried. Because right up to the end, we got a Rule 50A decision, judgment is a matter of law. And Rule 50A allows a judgment to be entered as a matter of law, quote, after a party has been fully heard on an issue during a jury trial. That is a judgment with preclusive effect. And right in Miller's- What about the general principle concerning whether raising one issue, you can raise one defense issue and not be precluded with respect to others? Right. So that has two components. The first is the very specific issue of obviousness here was litigated. And right in Miller tells you that says, this is a quote from him, that the collateral stop applies to any issue framed by the pleadings and not withdrawn, even though it has not been raised at trial in any way. This was framed by the pleadings, it was in the pretrial orders. Apple was denied the ability to withdraw it, and it lost on a Rule 50A judgment. The issue of obviousness itself was tried. In fact, the reference, the prior reference that Apple was pushing during the trial, Kyuchi, if you were to take a look at their expert report, which is at 28,961- You don't want to answer the broader question. Okay. And the broader question is, yes, we think that at least when you're talking about anticipation and obviousness, invalidity is a single issue. And it's a single issue- In other words, a prior art issue as opposed to a written description issue. Exactly. Because it's the question of validity in light of the prior art. And so when courts are trying to figure out what constitutes a single issue, they look at things like, would you expect pretrial discovery to touch on all this? And if you look at this case, pretrial discovery is rife with discussions about what is the prior art? What renders it obvious? So in this case, if it was remanded, then they'd be free to bring up 101, right? I'm sorry? They would be free to bring up 101. I think that having not raised it before and having had it come up on appeal and not having asked for 101, there would be a mandate issue on that. But I think in some other case, if you're looking for issue preclusion, I think 101 might well be out there if one takes the narrower view of invalidity being invalidity in light of the prior art. I think there's another point, which is if you're looking at the actual trial of evidence, at page 28,961 is their expert report. And the prior art reference they're referring to, Kiyuchi, is there both as an anticipation reference and as an obviousness reference. It's a single reference obviousness argument. So when they're putting in Kiyuchi at trial, that's an overlap with the exact evidence they're using for anticipation. And so when courts are looking at whether or not something's a single issue or the degree of overlap, and here the degree of overlap was 100%. So regardless of whether the court would say across the board, for collateral estoppel purposes, invalidity is a single issue. Certainly when you're looking at invalidity in light of prior art and the prior art overlaps and the discovery covers all that prior art, the answer should be it's collateral estoppel. How about the fact that this claim is basically dead anyway because of a ruling in another path? Why would we continue on this case, finishing off our infringement of what we know is a dead patent, at least claim? So claim 5 of 504 hasn't been invalidated by this court, hasn't been canceled by the PTO. In fact, this court has twice reversed PTO efforts to invalidate that claim. What Apple's asking is for the court to take a different patent that was invalidated under a burden of proof and apply that to collateral estoppel, claim 5 of the 504, in a case where a higher burden of proof applies. And as a matter of hornbook collateral estoppel law, you can't do that. The Supreme Court in a case called Grogan said, no, you have to have the same burden of proof. B&B Hardware makes that clear. We're not talking about collateral estoppel. Pardon? We're talking about a claim that has been found invalid. So in another patent, and it's here now, you have an infringement verdict of sizable. And we'd be going through a useless exercise to continue along, would we not? No, I don't think at all. Well, first, the vast bulk of the verdict stands on the VPN alone. I think $480 million of the verdict. How do we know that, by the way? So that is based on the fact that the parties agreed that the jury reused a rate of $1.20 per unit, regardless of the amount of infringement. And there was considerable overlap. So even if it infringed two patents rather than one, the amount was the same. And under Catalina lighting, likewise, it doesn't really matter how many patents you infringe. One infringement yields to one royalty. And so both parties agreed on the amount. So do you think it's a ministerial exercise to trim the remedy to the $135, $151? Yes, actually, it would. And in fact, there is an exhibit that went through. And I'll give Mr. Lee my copy. But the jury saw an exhibit that did VPN on demand only because there was some lack of overlap. And everybody agreed on the number of units, 384,528,255. That's from their expert. And the royalty amount was $461 million. So a relatively small portion, admittedly, a lot of money, but a relatively small portion. Is it sufficiently evident that a court can legitimately say the jury adopted that calculation? Well, certainly when the parties agreed, the royalty rate used by the jury and the royalty base, it is ministerial. And there's a case called Oynous v. Walgren. And I think under Oynous v. Walgren, you can remit down, and it's the plaintiff's option to either retry or accept the remitter, down to the number that's- Unless there's genuine uncertainty about what the jury actually thought. Yeah. And I don't think in this case there can be any genuine certainty, because if you look at Apple's brief at page 27, they admit the jury used $1.20 per unit, regardless of the number of infringements. And in fact, the number that the royalty base was agreed on by both experts at 384 million units. Are there different products for the 151,135, the VPN and the FaceTime? And so all the things that had FaceTime also had VP on demand, but not everything on VPN on demand had FaceTime. Is that agreed? I think that is agreed. What do you mean to say? The overlap is just that the VPN demand is somewhat narrower, but it's narrower only to the tune of 50 million units. And so it doesn't affect the verdict as dramatically as- So you're saying it's agreed that the VPN is a subset of the FaceTime, and it's also agreed by how much it's a subset? I think the record is clear that both experts based on their, yes, I think that it would be impossible to look at their record and say they came out differently in the parties' concessions. I would have to defer to Mr. Lee to see if he agrees with me, but I don't think it's possible to actually dispute that. But even setting that aside, I don't think it's correct to say that claim five of the 504 is in any sense dead. And I think Fresenius tells you how you can know if a patent is dead. And a patent is dead when it's canceled, when the PTO withdraws. Well, you used a fairly nice phrase in your brief, slated for cancellation. Correct. So pronounced annulled, void ab initio by a properly final Article III involving or Article III bypassed forum is when the only thing left is a ministerial action about which the PTO seems not to be particularly- that doesn't care very much. I gather every year or so it looks and sees which ones do we have to cancel, but nothing really turns on that. So pronouncement of annulment is necessary. And that hasn't been done on 504-5, right? But it has been done on 211-5. Well, 211 hasn't gone through that either. Nothing's been actually canceled. No, but it's been pronounced, slated for cancellation in your phrase. But I think that it's- Subject to cert review. Judge Ronto, I think the presumption that you're running with is that just because Claim 5 of the 211 was pronounced invalid and upheld by this court, that necessarily the PTO will reach the same result with respect to Claim 5- No, no, no. I understand that you have some potentially important, potentially dispositive procedural and authority arguments about the role of the old inter-parties re-exam and its inconsistency with using collateral estoppel to be inconsistent with 317. What you don't seem to have- I have not seen you present an argument that says, how could 504-5 possibly be invalid if 211-5 is invalid? So I think as a matter of law, what matters here and what's been asked for application is collateral estoppel. And collateral estoppel cannot apply to the difference of burdens. And those burdens make an enormous difference. So specifically with respect to Claim 5 of the 211, the PTO invalidated that based on the notion that a reference called Pravino had the indication that it supports secure communications. And while Pravino did- There's a difference of burdens in the patent office because that's what the statute says. And when it's dead in the patent office, even though if there had been the same burden as in the district court, it might have been different. That's not something we can deal with. Correct. But I think the answer is that for collateral estoppel, it's not- you have to take the burden of proof into account. Is it collateral estoppel or is it that the claim no longer lives? The claim no longer lives once it's canceled. And we do not believe Claim 5. If we're going to defer to the PTO, let's see what the PTO does with Claim 5. We do not believe that PTO will patent. That has not been overturned by the PTO and upheld by this court. It's twice reversed, the efforts. What do you expect the timing to be once, what is it, Tuesday or something, the mandate issues on, I can't remember the numbers, 1571, 1791, the one that the secondary hearing was just- No, not the secondary hearing, the other one. So I don't know the precise time, but it will certainly be a period of time before the PTO acts. And then cancellation doesn't take effect until this court would affirm. And I think when you're looking at this, it's not as if Apple hasn't had nine years, nine years to challenge these patents and get them declared invalid. We've been litigating this, and Apple's tried and tried, but what it hasn't done is succeeded in having the claim, that fast-remaining claim of this patent, declared invalid. This court $480 million on this judgment. Yes, that's correct, because that's what would remain based on VPN on demand alone. And so even without the 504, you can just do a ministerial calculation, and the number is still $480 million. But at some point, Article III courts, their decisions have to have meaning. At some point, they have to become final. We can't constantly wait for the next IPR, which can be brought by anybody. There's no requirement of standing to bring an IPR, and wait for its outcome. And after nine years of litigation, and four trials, it's time. Now is that time. Apple gives us no reason to believe that the standards for a stay, and the standards of stay are set, that it would simplify litigation, et cetera, will be met if we sit around and wait for yet another tribunal to go through this. And we actually don't think that this patent is going to be invalidated for the variety of reasons that you gave, Judge Toronto. And for that reason, we're just reciting what you said. Yes, well, we believe in what we said, and we like having it recited by you. So given that, it seems to me that after Apple's had nine years to get these invalidated, the proper answer is for the courts to pass on the case and make the decision. Article III courts are here for a reason. It's their job is not superseded by that of the PTO. And it's certainly not superseded by the PTO based on IPRs, which can be filed by any person at any time. If that were the rule, if we waited for them for that, then there would never be a case that could ever go final. In principle, we agree that we're not superseded by the PTO. Pardon? In principle, we agree that we're not superseded by the PTO. I think in principle, in fact, and in practicality, that would be a horrific result. If the court has no further questions, it looks like I'm past my time. I'd be happy to address VP Non-Demand briefly if there is an interest in that. But if the court has no questions, I'm happy to defer. Thank you, Mr. Lampkin. Mr. Lee, three minutes for rebuttal. Yes, sir. I can be very brief, Your Honor. First, Judge Toronto, on your question, if you go to Appendix 21108, you will see, in response to your earlier question, our proposed construction. I saw that already. And the second portion is the addition. The interesting thing, having had Mr. Lampkin's what is a domain name service system? Now, we can give you a precise articulation based upon the claim interpretation today. I don't think you can give an answer based upon what they've said to you today. Second point, Vernetics asked the District Court on the issue, preclusion issue, Your Honor. He asked, they asked the District Court to enter a judgment on obviousness. The 22395 to 396, because it had never been presented to the jury. And that is why there is no issue preclusion. Third point is, on this different burden of proof, in both the X-FY and the AIL cases, it was a determination by the PTO applied to a District Court proceeding. It's been done before. And the last point is this, Judge Toronto, it's not a ministerial act. While we agreed that if four patents were infringed, it would be a single rate, we said at trial that if it were two patents, it would be a single rate, but a different rate. If it were three patents, it would be a single rate, but a different rate. So it's not a ministerial computation of what the royalty base is. Mr. Lampkin's accurate in terms of VPN on demand being a subset. But there is a different rate question and a different base question. It's not a ministerial act. Thank you, Your Honor. Thank you, Mr. Lee. We'll take the case under advisement.